IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH,
CENTRAL DIVISION

| | |
|---|---|
| JESSE CARL TRENTADUE, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civ. Action No. 2:04CV 00772 ~~DB~~ DAK<br>) |
| FEDERAL BUREAU OF INVESTIGATION, | )<br>) |
| Defendant. | )<br>) |

## SECOND DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1) I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney and have been licensed to practice law in the State of Texas since 1980.



27

(2) In my current capacity as Section Chief, I supervise the Freedom of Information/Privacy Acts ("FOIPA") Litigation Support Unit. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA and Privacy Act ("FOIPA") request of Jesse Carl Trentadue and have reviewed the teletype attached hereto as Exhibit A. I am also familiar with the declaration prepared by former SA Emanuel ("Manny") Johnson Jr., and find that it contains a fairly accurate description of an FBI communication known as a "teletype," the Manual of Investigative Operations and Guidelines (MIOG), FBI searching procedures and FBI file numbers.[1] This Declaration incorporates and supplements the First Declaration dated December 9, 2004.

(4) The purpose of this declaration is to respond to PLAINTIFF'S COMBINED MOTION TO SUPPLEMENT RECORD AND MEMORANDUM IN SUPPORT dated December 27, 2004.

---

[1] A new file numbering system was instituted by the FBI in 1989. File numbers are now numbered sequentially within each office instead of within each file classification. The 174 does indicate a bombing matter and the OC indicates the Oklahoma City office; however, the 56120 does not indicate the number of actual case files opened within the bombing classification.

-2-

## CORRESPONDENCE

(5) Correspondence related to plaintiff's FOIA request was described in the Declaration of David M. Hardy (hereinafter "Hardy Declaration") dated December 9, 2004, ¶¶ 5-9.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(6) The explanation of the Central Records System ("CRS) was described in the Hardy Declaration ¶¶ 10-14.

## EXPLANATION OF THE SEARCH CONDUCTED FOR THE TELETYPE DATED JANUARY 4, 1996

(7) The initial search of the CRS indices at FBIHQ and the Oklahoma City Field Office, ("OCFO") for a Former FBI Director Freeh memorandum dated on or about January 4, 1996, revealed that, based on the information provided in plaintiff's initial request letter to FBIHQ and the OCFO, the FBI could not locate the original document.

(8) The initial search of the CRS indices at FBIHQ and the OCFO for the Former FBI Director Freeh memorandum dated on or about January 4, 1996, was conducted by using the search term "Southern Poverty Law Center" as described in the Hardy Declaration ¶ 12. Additionally, a search for the memorandum using the name " Timothy McVeigh," failed to reveal the January 4, 1996 memorandum.

(9) Based on new information attached as Exhibit A to plaintiff's November 23, 2004 REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, it was determined that the document was a teletype dated January 4,

-3-

1996. An electronic search of file 174A-OC-56120 for teletypes dated January 4, 1996, was conducted. This additional search revealed the teletype in question which was contained within the FBI's OKBOMB investigative file which investigation was conducted pursuant 18 U.S.C. § 844 (d).[2]

## EXPLANATION OF FORMAT UTILIZED FOR THE JUSTIFICATION OF DELETED MATERIALS

(10) The teletype consisting of four pages with redactions was processed to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. To further describe the information withheld could identify the material sought to be protected, thus negating the purpose of the exemptions. Copies of the processed pages are attached hereto as Exhibit A. Each page of Exhibit A is consecutively numbered 1-4 in the lower right-hand corner. The exemptions asserted by the FBI as grounds for non-disclosure of portions of pages are FOIA Exemptions 6, 7(C) and 7(D).

(11) Copies of the pages contain, on their face, coded categories of exemptions, which will be described in further detail below. These coded categories detail the nature of the information withheld pursuant to the provisions of the FOIA. Further describing the information in more detail could risk the identification of the very material that the FBI is protecting. No reasonably segregable, non-exempt portions were withheld from plaintiff. The coded categories

---

[2] A second search for an FD-302 regarding an interview of plaintiff was not conducted. All information received or made available to the FBI during the course of an investigation is evaluated for its pertinence to the investigation and Special Agents are responsible for indexing only that information deemed necessary for future retrieval.

-4-

are provided to aid the Court's review of the FBI's explanations of FOIA exemptions used to withhold the protected material. The FBI has determined that all material which the FBI has withheld is exempt from disclosure pursuant to a FOIA exemption.

## MECHANICS OF USING THE CODED FORMAT WITH THE EXEMPTION CATEGORIES

(12) A coded format is used to assist the Court and plaintiff in reviewing the information withheld within the context of the teletype. Each instance of information withheld pursuant to the FOIA on the attached document is accompanied by a coded designation that corresponds to the categories listed below. For example, when "(b)(7)(C)-1" appears on a page, the (b)(7)(C) designation refers to Exemption (b)(7)(C) of the FOIA concerning "Unwarranted Invasion of Privacy." The numerical designation, (-1) following the "(b)(7)(C)" narrows and specifically describes the main category of material deleted which in this example is "Names of and Information Pertaining to Third Parties Merely Mentioned." Listed below are the coded categories used to explain the FOIA exemptions asserted to withhold protected material:

## SUMMARY OF JUSTIFICATION CATEGORIES

| Category (b)(6) | Clearly Unwarranted Invasion of Personal Privacy |
|---|---|
| (b)(6)-1 | Names and Information Pertaining to Third Parties Merely Mentioned [Used in conjunction with (b)(7)(C)-1] |
| (b)(6)-2 | Name Pertaining to a Third Party of Investigative Interest [Used in conjunction with (b)(7)(C)-2] |
| (b)(6)-3 | Names of FBI Personnel (Both Special Agents and Support) [Used in conjunction with (b)(7)(C)-3] |

| **Category (b)(7)(C)** | **Unwarranted Invasion of Personal Privacy** |
|---|---|
| (b)(7)(C)-1 | Names and Information Pertaining to Third Parties Merely Mentioned [Used in conjunction with (b)(6)-1] |
| (b)(7)(C)-2 | Name Pertaining to a Third Party of Investigative Interest [Used in conjunction with (b)(6)-2] |
| (b)(7)(C)-3 | Names of FBI Personnel (Both Special Agents and Support) [Used in conjunction with (b)(6)-3] |
| **Category (b)(7)(D)** | **Confidential Source Material** |
| (b)(7)(D)-1 | Information provided by a Cooperating Witness (CW) |

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(13) 5 U.S.C. § 552(b)(6) exempts from disclosure:

personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(14) When asserting this exemption, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the document at issue. In withholding the information, each individual's privacy interest was balanced against the public's interest in disclosure. In making this analysis, public interest information was determined to be information which would shed light on the FBI's performance of its statutory duties. In each instance where information was withheld, it was determined that individual privacy rights outweighed the public interest in disclosure. To reveal the names and/or identifying data of third party individuals in the context of the teletype could reasonably be expected to cause embarrassment and humiliation and thus

constitute an unwarranted invasion of personal privacy. There is no legitimate public interest in the information that has been withheld pursuant to Exemption (b)(6).

### (b)(6)-1  Names and Information Pertaining to Third Parties Merely Mentioned

(15) Exemption (b) (6)-1 has been asserted to withhold the names of third parties who are merely mentioned in the teletype dated January 4, 1996. These individuals are not of investigative interest to the FBI, but are merely mentioned in this document. Disclosure of the identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them which may cause embarrassment. For these reasons, the FBI has determined that these third party individuals merely mentioned in this file maintain a strong privacy interest in not having their identities disclosed. After identifying the substantial privacy interests of the third parties merely mentioned in this file, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information. Accordingly, the FBI determined that the disclosure of this information would constitute an unwarranted invasion of personal privacy. Thus, the FBI has decided to protect the names of these third parties merely mentioned in the teletype pursuant to Exemption (b)(6)-1[3]. ( Cited in conjunction with (b)(7)(C)-1)

### (b)(6)-2     Names of and Identifying Information Pertaining to a Third Party of Investigative Interest

(16) Exemption (b)(6)-2 has been asserted to protect the name of a

---

[3] Exemption (b)(6)-1 was cited on pages 2, 3 and 4

third party of investigative interest to the FBI. Being linked with any law enforcement investigation carries with it a strong negative connotation and a stigma. To release the identity of this third party as the subject of a law enforcement interest would not only constitute an unwarranted invasion of his/her personal privacy, but could subject this individual to harassment or embarrassment, or result in undue public attention. Accordingly, this individual maintains a substantial privacy interest in not having his/her identity disclosed.

(17) In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identity of this third party because the information will not shed light on the operations and activities of the FBI, but would only reveal sensitive law enforcement information concerning a third party. Any such disclosure would constitute a clearly unwarranted invasion of his/her personal privacy.

(18) In balancing the substantial privacy interest, the FBI determined that this information was properly withheld pursuant to Exemption (b)(6)-2.[1] (Cited in conjunction with (b)(7)(C)-2.)

### (b)(6)-3    Names of FBI Personnel (Special Agent ("SA") and Support)

(19) Exemption (b)(6)-3 has been asserted to protect the names and identifying information of FBI SAs responsible for conducting and supervising the investigative activities reported in the the document. The names of FBI SAs were withheld since their assignment to investigations is not by choice, and publicity (adverse or otherwise) regarding their involvement in a particular investigation may seriously hamper their effectiveness in conducting future

---

[1]Exemption (b)(6)-2 was cited on pages 1 and 3.

investigations. The privacy consideration is also to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct inquiries into violations of various criminal statutes and in national security cases. They come into contact with all strata of society. They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious, intrusions into people's lives. Many of these people carry grudges which last for years and seek any excuse to harass the agent they deem responsible for these intrusions. The publicity associated with the release of an FBI SA's identity in connection with a particular investigation, such as the FBI's investigation involving the individuals mentioned on these documents, could rekindle animosity towards that agent. There is not public interest to be served through the release of these names.

(20) The names of and/or identifying data of FBI support personnel have also been redacted pursuant to Exemption (b)(6)-3. These employees were assigned to handle tasks relating to the FBI OKBOMB investigation. They were assigned to a positions to handle tasks relating to the official law enforcement investigation; and therefore, could become targets of harassing inquiries for unauthorized access to information relative to this or other investigations, if their identities were released. Ultimately, disclosure of the names of FBI SAs and support employees would shed no light on the performance of the FBI's statutory duties. Thus, the FBI has determined that disclosure of the names of these employees would constitute a clearly unwarranted invasion of their personal privacy. Therefore, the FBI has asserted Exemption 6 to

protect the identities of its employees. Exemption (b)(6)-3 has been cited in conjunction with exemption (b)(7)(C)-3.[5]

## EXEMPTION (b)(7)(C)-UNWARRANTED INVASION OF PRIVACY

(21) 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

"records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ."

(22) In withholding information from disclosure pursuant to this exemption, the FBI is required to balance the privacy interests of the individuals mentioned in the teletype against any public interest in disclosure. In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of each individual's privacy interest. The FBI identified the public interest in disclosure of the information to be whether the information in question would inform plaintiff or the general public about the FBI's performance of its mission to enforce federal criminal statutes and/or how the FBI actually conducts its statutory duties, namely, its internal operations and investigations. Every effort has been made to release all segregable information contained in the four (4) pages released to plaintiff with redactions without infringing upon the privacy rights of the individuals mentioned in these documents.

### (b)(7)(C)-1  Names of and Information Pertaining to Third Parties Merely Mentioned

( 23) Exemption (b)(7)(C)-1 has been asserted to withhold the names of third parties who are merely mentioned in the teletype dated January 4, 1996. These individuals are not of investigative interest to the FBI, but are merely mentioned in these documents. Disclosure of the

---

[5]  Exemption (b)(6)-3 was cited on page 1 of Exhibit A.

identities of these third parties in this context could cause unsolicited and unnecessary attention to be focused on them which may cause embarrassment. For these reasons, the FBI has determined that these third party individuals merely mentioned in this teletype maintain a strong privacy interest in not having their identities disclosed. After identifying the substantial privacy interests of the third parties merely mentioned in the teletypes, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information. Accordingly, the FBI determined that the disclosure of this information could constitute an unwarranted invasion of personal privacy. Thus, the FBI has decided to protect the names and identifying data of these third parties merely mentioned in the responsive documents pursuant to Exemption (b)(7)(C)-1.[6] (Cited in conjunction with (b)(6)-1)

### (b)(7)(C)-2    Name of and Identifying Information Pertaining to a Third Parties of Investigative Interest

(24) Exemption (b)(7)(C)-2 has been asserted to protect the name and identifying information pertaining to a third party of investigative interest to the FBI. Specifically, the FBI withheld the name of and certain details surrounding the FBI's investigation of a third party who was a possible subject of the investigation referred to in the teletype. Being linked with any law enforcement investigation carries with it a strong negative connotation and a stigma. To release the identity of this third-party individual as the subject of law enforcement interest would not only constitute an unwarranted invasion of his/her personal privacy, but could subject this individual to harassment or embarrassment, or result in undue public attention. Accordingly, this individual maintains a substantial privacy interest in not having his/her identity disclosed. In considering the

---

[6] Exemption (b)(7)(C-1 was cited on pages 2, 3 and 4 of Exhibit A.

public interest in this information, the FBI determined that there is no public interest to be served by releasing the identity of this third-party individual because this information will not shed light on the operations and activities of the FBI, but would only reveal sensitive law enforcement information concerning a private citizen. Any such disclosure could constitute an unwarranted invasion of his/her personal privacy.

(25) In balancing the substantial privacy interest that these individuals have in this information against no legitimate public interest in its disclosure, the FBI determined that this information was properly withheld pursuant to Exemption (b)(7)(C)-2.[7] (Cited in conjunction with (b)(6)-2)

### (b)(7)(C)-3    Names of FBI Personnel Special Agents ("SAs") and Support

(26) Exemption (b)(7)(C)-3 has been asserted to protect the names and identifying information of FBI SAs responsible for conducting and supervising the investigative activities reported in the teletype. The names of FBI SAs were withheld since their assignment to investigations is not by choice, and publicity (adverse or otherwise) regarding their involvement in a particular investigation may seriously hamper their effectiveness in conducting future investigations. The privacy consideration is also to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct inquiries into violations of various criminal statutes and in national security cases. They come into contact with all strata of society. They conduct searches and make arrests, both of which constitute reasonable, but nonetheless serious, intrusions into people's lives. Many of these people carry grudges which last for years

---

[7]Exemption (b)(7)(C)-2 was cited on pages 1 and 3 of Exhibit A.

and seek any excuse to harass the agent they deem responsible for these intrusions. The publicity associated with the release of an FBI SA's identity in connection with a particular investigation, such as the FBI's investigation involving the individuals mentioned in this document, could rekindle animosity towards that agent. There is not public interest to be served through the release of these names.

(27) The name(s) of FBI support personnel have also been redacted pursuant to Exemption (b)(7)(C)-3. These employees were assigned to handle tasks relating to the official investigation referred to in this document. They were and possibly remain in positions of access to information regarding official law enforcement investigations; and therefore, could become targets of harassing inquiries for unauthorized access to investigations, if their identities were released. Ultimately, disclosure of the names of FBI SAs and support employees would shed no light on the performance of the FBI's statutory duties. Thus, disclosure of the names of these employees could constitute an unwarranted invasion of their personal privacy; therefore, the FBI has asserted Exemption (b)(7)(C).[8] (Exemption (b)(7)(C)-3 has been invoked in conjunction with exemption (b)(6)-3.)

## EXEMPTION (b)(7)(D) – CONFIDENTIAL SOURCE INFORMATION

(28)   5 U.S.C. § 552 (b)(7)(D) provides protection for:

records or information compiled for law enforcement purposes, but only to the extent that the production of law enforcement records or information...could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority of any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national

---

[8]Exemption (b)(7)(C)-3 was cited on page 1 of Exhibit A.

security intelligence investigation, information furnished by a confidential source.

(29) Numerous confidential sources report to the FBI on a regular basis and are "informants" within the common meaning of the term. These sources provide information under a variety of circumstances, including either an express or an implied assurance of confidentiality. Releasing the information provided by these sources may likely reveal a confidential source's identity. The release of a source's identity would forever eliminate that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. It is only with the understanding of complete confidentiality (whether express or implied) that the aid of such sources can be enlisted and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. Thus, certain information provided by a CW has been protected pursuant to Exemption 7(D).

### (b)(7)(D)-1  Information provided by a CW

(30) Exemption (b)(7)(D)-1 was asserted to protect certain information provided to the FBI by a CW under an express promise of confidentiality. The information was provided to FBI Headquarters by the Cincinnati Field Office on January 2, 1996, in connection with the FBI's BOMBROB investigation. Upon review of the information, it was provided by teletype to FBI offices in Birmingham, Charlotte, Cincinnati, Oklahoma City and Omaha as possible lead

information in the OKBOMB investigation.[9] To further describe any information at this time would reveal the identity of the CW.[10]

## CONCLUSION

(31) Plaintiff has been provided all responsive records pursuant to his FOIA request to the FBI. Furthermore, all segregable information has been released to plaintiff and no reasonably segregable portion of the with material can be released. As demonstrated above, the only information withheld by the FBI consists of information that would infringe upon the privacy of third parties, including FBI personnel, or would disclose the identity of a CW. This information cannot be further segregated without revealing the privileged information itself.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibit A attached hereto is a true and correct copy.

Executed this __31st__ day of January, 2005.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Federal Bureau of Investigation
Washington, D.C.

---

[9] A teletype is designed to expeditiously alert other field offices of a pertinent development in a case which requires prompt attention.

[10] (B)(7)(D)-1 was cited on Exhibit A pages 2 and 3.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JESSE CARL TRENTADUE,<br><br>  Plaintiff,<br><br>  v.<br><br>FEDERAL BUREAU OF INVESTIGATION<br><br>  Defendant. | Civ. Action No. 2:04CV 00772 DB |

# EXHIBIT A

```
0005  MRI 00811
RR FBIBH FBICE FBICI FBIOK FBIOC FBIOM CASE117
DE RUCNFB #0051 0050216
ZNY EEEEE
R 041945Z JAN 96
FM DIRECTOR FBI (174A-OC-56120)
TO FBI BIRMINGHAM/ROUTINE/
FBI CHARLOTTE/ROUTINE/
FBI CINCINNATI/ROUTINE/
FBI CP OKLAHOMA/ROUTINE/
FBI OKLAHOMA CITY/ROUTINE/
FBI OMAHA/ROUTINE/
BT
UNCLAS E F T O
CITE: //0533//
```

SUBJECT: OKBOMB; EID; MAJOR CASE 117; OO: OKLAHOMA CITY.

REFERENCE CINCINNATI TELETYPE DATED 1/2/96, CAPTIONED "MILITIA INFORMATION; DOMESTIC SECURITY/TERRORISM (DS/T) - BOMBROB; BR(A); OO: OMAHA". (S).

PRIOR BUREAU COMMUNICATIONS STATED THAT SEVERAL COMMON

Handwritten annotations: "We need to keep all the info on [redacted] in one place (like a subfile perhaps) T.G. 1/6/96"; "HOT!"; stamp "JAN 18 1996 FBI-OKLAHOMA CITY"; "174A-OC-56120-Sub-1"

PAGE TWO DE RUCNFB 0051 UNCLAS E F T O

CHARACTERISTICS UTILIZED BY THE ROBBERS IN THE BOMBROB INVESTIGATION INCLUDED THE USE OF SPANISH TERMINOLOGY AND THE RENTING OF GETAWAY VEHICLES IN THE NAMES OF PROMINENT FBI OFFICIALS. ALSO POINTED OUT WAS THE POSSIBILITY THAT ONE OF THE ROBBERS MAY HAVE HAD PRIOR MILITARY LAW ENFORCEMENT OR EXPLOSIVES TRAINING.

IN REFERENCED TELETYPE, A CINCINNATI CW WHO KNOWS ▮▮▮▮ b6-1 / b7c-1

▮▮▮▮ TO THE ARYAN NATIONS (AN), CHURCH OF JESUS CHRIST CHRISTIAN, HAYDEN LAKE, ID (100A-SU-9595), STATED THAT ▮▮ WAS A ▮▮▮▮ WHO IN b7D-1 ADDITION TO ▮▮▮▮ EXPERTISE, ALSO POSSESSED KNOWLEDGE OF ▮▮▮ AND ▮▮▮. ▮▮ IS KNOWN TO PROVIDE SUCH TRAINING TO AN MEMBERS DURING ANNUAL AN CONGRESS SESSIONS HELD IN HAYDEN LAKE.

CW RECALLED THAT, APPROXIMATELY THREE YEARS AGO WHILE HE WAS IN THE HOME OF ONE ▮▮▮, ▮▮▮, ▮, ▮▮▮ RECEIVED b6-1 / b7c-1 A TELEPHONE CALL FROM ▮▮ WHO INFORMED THAT HE WAS, AT THAT TIME, IN THE STATE OF VERMONT AND HAD JUST COMPLETED COMPILING A LIST OF NAMES OF ▮▮▮▮. CW CONTINUED THAT THIS b7D-1 INFORMATION WAS CONFIRMED BY AN HEAD PASTOR RICHARD BUTLER APPROXIMATELY 13 MONTHS AGO. ▮▮ IS KNOWN TO THE FBI AS AN

2

PAGE THREE DE RUCNFB 0051 UNCLAS E F T O

ATTORNEY WHO REPRESENTS RADICALLY CONSERVATIVE INDIVIDUALS/ MOVEMENTS AND IS THE ███ OF ███ WHO REPRESENTS THE C.A.U.S.E. FOUNDATION, WHICH HAS AN AFFILIATION.

b7D-1
b6-1
b7C 1

IN EARLY 1995, CW ███ AND ███ AT THEIR ███ ███, PROPERTY AND SAW SEVERAL PLASTIC FOLDERS CONTAINING AUDIO TAPES LABELED "LEARNING SPANISH". ███ TOLD CW THAT HE WAS LEARNING SPANISH AND THAT IT WAS IMPORTANT TO KNOW OTHER LANGUAGES.

*WHILE THERE IS NO EVIDENCE TO DIRECTLY LINK* ███ *TO THE BOMBROB INCIDENTS, IT WOULD APPEAR POSSIBLE THAT* ███ *COULD HAVE KNOWLEDGE AND/OR CONSPIRATORIAL INPUT INTO SUCH CRIMINAL ACTIVITY.*

INFORMATION HAS ALSO BEEN RECEIVED THROUGH THE SOUTHERN POVERTY LAW CENTER (SPLC) THAT ONE ███, AKA ███ ███ TELEPHONE CALL FROM TIMOTHY MCVEIGH, ON OR ABOUT 4/17/95, TWO DAYS PRIOR TO THE OKBOMB ATTACK, WHEN ███, PER A SOURCE OF THE SPLC, WAS IN THE WHITE SUPREMACIST COMPOUND AT ███, OK. ███ ALLEGEDLY HAS HAD A LENGTHY RELATIONSHIP WITH TIMOTHY MCVEIGH, ONE OF TWO INDICTED OKBOMB DEFENDANTS. THE SOURCE OF THE SPLC

b6-2
b7C-2

3

PAGE FOUR DE RUCNFB 0051 UNCLAS E F T O

b6-2
b7c-2
ADVISED THAT ▓▓▓▓▓ IS CURRENTLY RESIDING WITH ▓▓▓▓▓ IN b6-1
▓▓▓▓▓ NC, AND PLANS TO LEAVE THE U.S. VIA MEXICO, IN b7c-1
THE NEAR FUTURE. THE SOURCE FURTHER ADVISED THAT HE/SHE HAS LEARNED THAT ▓▓▓▓▓ FOR AN UNKNOWN REASON.

PRIOR OKBOMB INVESTIGATION DETERMINED THAT MCVEIGH HAD PLACED A TELEPHONE CALL TO ELOHIM CITY ON 4/5/95, A DAY THAT HE WAS BELIEVED TO HAVE BEEN ATTEMPTING TO RECRUIT A SECOND CONSPIRATOR TO ASSIST IN THE OKBOMB ATTACK. THE OKBOMB COMMAND POST IS ATTEMPTING TO VERIFY THE VERSION OF EVENTS AS SET FORTH BY THE SOURCE AND TO DEVELOP FURTHER INFORMATION.

THE ABOVE IS PROVIDED FOR INFORMATIONAL PURPOSES.

BT

#0051

NNNN

4